UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED

00 JAN 28 AM 11:45

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

JAN 2 8 2000

| | |
|---|---|
| MARTIN LEONARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CV 99-BU-666-M |
| | ) |
| AUTOZONE, | ) |
| | ) |
| Defendant. | ) |

## Memorandum Opinion

In this action, Plaintiff Martin Leonard asserts claims against his former employer, Defendant AutoZone, Inc., pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., alleging that he was subjected to a hostile work environment because of sex during two separate periods of employment at AutoZone's store in Pell City, Alabama, and that he was terminated in retaliation for making complaints about such harassment. Leonard also brings claims against AutoZone under Alabama state law for invasion of privacy and for battery. Now before the Court is AutoZone's motion for summary judgment on all claims. (Doc. No. 17). The parties have filed evidence and briefs in support of their respective positions on the motion, which is now ripe for decision. The Court concludes that AutoZone's motion for summary judgment is due to be GRANTED IN PART, as to (1) the Title VII hostile work environment claim to the extent it is based on events occurring during Leonard's first period of employment at the Pell City store, (2) the Title VII retaliation claim, and (3) the invasion-of-privacy claim, AND DENIED IN PART, as to (1) the Title VII hostile work environment claim to the extent it is based upon events occurring during Leonard's second period of employment at the Pell City store and (2) the battery claim.

29

## I.  SUMMARY JUDGMENT STANDARDS

Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial.  On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact.  <u>Id</u>. at 323.  The movant's burden is not meager; he must "point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608  (11th Cir. 1991).  Thus, it is never enough simply to state that the non-moving party cannot meet its burden at trial.  <u>Id.</u>  Once the moving party has satisfied its initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial."  <u>Howard v. BP Oil Company</u>, 32 F.3d 520, 523 (11th Cir. 1994).  Rule 56(e) requires the nonmoving party to "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exists a genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 324; <u>Cottle v. Storer Communication, Inc.</u>, 849 F.2d 570, 575 (11th Cir. 1988).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary

burden. <u>Anderson</u>, 477 U.S. at 254-55. "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." <u>Hairston v. Gainesville Sun Publishing Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993). In making its determination, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. <u>Rooney v. Watson</u>, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing <u>Hale v. Tallapoosa Co.</u>, 50 F.3d 1579, 1581 (11th Cir. 1995)). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" <u>Tidwell v. Carter Products</u>, 135 F.3d 1422, 1425 (11th Cir. 1998) (citing <u>Carter v. City of Miami</u>, 870 F.2d 578, 581 (11th Cir. 1989)).

## II. BACKGROUND[1]

AutoZone is an automotive parts retailer with many stores nationwide. In May 1993, AutoZone hired Leonard to work as a part-time sales representative in its store located in Birmingham, Alabama. In March 1994, Leonard became a full-time employee, working principally in AutoZone's store in Pell City. Around March 1995, Leonard was promoted to parts sales manager at the Pell City Store, a position he held until about January 1997, when he accepted a promotion to be the assistant manager of AutoZone's store in Pelham, Alabama. Soon afterwards, however, Leonard became dissatisfied with the 112-mile round-trip daily commute between his residence in Pell City and the Pelham store, so he asked for a transfer back to the Pell City Store in order to spend more time with his family. AutoZone honored

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. <u>See</u> <u>Cox v. Administrator U.S. Steel & Carnegie</u>, 17 F.3d 1386, 1400 (11th Cir. 1994)." <u>Underwood v. Life Ins. Co. of Georgia</u>, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

this request.  However, Leonard's former parts sales manager position had been awarded to another employee once he departed to Pelham, so upon his return to Pell City in about mid-June 1997 he was relegated to a non-managerial sales position.  Leonard continued to work at the Pell City store in this capacity until his employment  was terminated on April 20, 1998.

Several months after Leonard was promoted to parts sales manager at the Pell City store in about March 1995, David Lampi became the manager at that location.  At that time, Lampi and two other employees, Kyle Parker and David Walton, began to engage in conduct that Leonard considered to be offensive and harassing.  According to Leonard this conduct occurred at the Pell City store more-or-less continuously from the time Lampi became manager until Leonard's termination.  However, Leonard was not subjected to harassment during the several months he worked at the Pelham store.  As the manager of the Pell City store, Lampi had supervisory authority over all its employees, including Leonard.  Prior to Leonard's transfer to Pelham in January 1997, Parker and Walton were Leonard's co-employees and had no supervisory authority over him, but upon his return to Pell City in mid-June 1997, they were both parts sales managers and his immediate supervisors.

The record shows that the workforce at the Pell City store during the period relevant to this suit was comprised mostly of men, none of whom appear to have considered themselves to be homosexual in orientation.   However, the majority of the conduct of which Leonard complains involves Lampi and Parker, particularly, affecting mannerisms associated with stereotypes of homosexual men, pretending to be homosexual, and engaging in inappropriate touching, including slapping on the buttocks and mock sex acts.  And while the evidence reasonably suggests that Leonard was subjected to sexually-focused remarks and conduct on what amounts to a daily basis, the record indicates that Lampi, Parker, or Walton were not genuinely interested in having sex either with each other, with Leonard, or with other males.  Rather, the evidence clearly shows that they were merely pretending to be homosexual as a kind of "game" and that Leonard understood this to be the case, although it still made him feel

embarrassed and uncomfortable.[2]

Likely the most offensive practice for which Leonard expresses his displeasure is "dry humping," whereby Lampi or Parker would simulate anal sex by standing behind another male employee, place his hands on the employee's hips and thrust his pelvis into the employee's buttocks. Plaintiff's Depo. at 122. See also Plaintiff's Ex. 9 at 3; Plaintiff's Ex. 11 at 4. It was an "everyday thing" for Lampi to attempt to do this to male employees, Plaintiff's Depo. at 122, though his favorite target was Parker, whom Plaintiff saw Lampi do it to "a lot." Id.; see also Plaintiff's Ex. 11 at 4. For his part, Parker would on these occasions voluntarily enhance the spectacle by breathing heavily and screaming out things like, "Oh, yes!" Plaintiff's Ex. 12 at 2; Plaintiff's Depo. at 131. Leonard alleges, however, that Lampi also "thrusted" him in this fashion on numerous occasions and that such "was old hat" to Lampi, Plaintiff's Depo. at 148, although Leonard could not say exactly how many times it happened. Leonard also mentions that he was the target of "dry humping" by Parker as well, although how often is unclear. See id. at 83. Leonard indicates, however, that he was "dry humped" in front of other employees on multiple occasions and that, one time, Lampi did it to him in front of Leonard's wife, at which time Lampi remarked to her that he was "going to take [Leonard] home with him." Id. at 59.

---

[2] See Plaintiff's Depo. at 117-18 ("It was an everyday fun thing with [Lampi] that he played around. That was his way of getting through the day, I guess. . . . [Lampi] was always wrestling, slapping you on your butt, making a joke of being a homosexual"); id. at 160 (whereby Leonard admits that he perceived homosexual remarks and conduct on the part of Lampi and Parker to be "horsing around," rather than done earnestly); id. at 191 (where Leonard recounts that he complained to Lampi's supervisor that Lampi, Walton, and Parker "play too much, joke around too much"); and id. at 195, 200, 202 (where Leonard refers to the conduct at the store as "horseplay.") See also id. at 173 (where Leonard relates that after he complained to Lampi about sexual remarks and conduct, Lampi replied, "Well, we're just playing around . . . . We just feed on you getting mad about it. Every time you get mad about it, it just makes us want to do it more"); Plaintiff's Ex. 9, 11, 12 &16 (where Lampi; Parker; Walton; and other store employees not accused of wrongdoing, Hank Abernathy, Roger Holden, James Hairston, indicate that the homosexual conduct was done in a joking manner or as "horseplay."). Nowhere in the record does Leonard indicate that he believed Lampi, Parker, or Walton had any sincere sexual interest in him or in other men.

Leonard also objects to other sorts of sexual remarks and physical contact he endured working at the Pell City store. For example, Leonard avers that "just about any time" he or another male employee bent down behind the counter, it was a "normal thing" for Lampi to walk up to the person, grab his own crotch and allude to oral sex by saying, "Why don't you do me a favor while you're down there." Plaintiff's Depo. at 119-21. Leonard also heard Lampi, Walton, and Parker discuss and joke about the relative sizes of their penises. See EEOC Charge; Plaintiff's Depo. at 160. Lampi often slapped Leonard on the buttocks, attended by such witticisms as, "Is that the way you like it?" and "How does that feel, Baby?" See id. at 85, 117-18, 152. Parker similarly slapped Leonard on the buttocks "more than [he could] remember," id. at 130, while Walton spanked male employees on a few occasions, Plaintiff's Ex. 12. Leonard's difficulties with Walton, however, deal primarily with roughhousing that lacked an apparent sexual component; Walton, would hit, wrestle with, run into and knock down Leonard and other male employees "all the time." See Plaintiff's Depo. at 131-32, 169-70. Lampi and Parker also engaged in the wrestling around, and Leonard would be pulled into it involuntarily by being grabbed by the shoulders and they would "sling[ ]" him and each other around the office. Id. at 153-54.

Lampi and Parker also employed a routine whereby they would pretend to be homosexual by talking with a lisp, hugging each other, and expressing mutual erotic desires by stating things to each other like, "You're my lover boy. Come over here and let's get it on," id. at 158-59; "I would like to spank you," Plaintiff's Ex. 11 at 4; and "You are a cute bitch, I'd like to take you home and fuck you," Plaintiff's Ex. 8. Leonard also recalls an incident where Lampi loudly remarked to another male employee in front of Leonard and a customer, "You know, if Marty [Leonard] wasn't around, me and you could be alone," Plaintiff's Depo. at 119. Lampi and Parker would, however, direct some of this sort of behavior towards other male employees, including Leonard. Lampi and Parker would place an arm around Leonard's shoulder and say things to him like, "This is my lover," "I want your sexy body" and "I want to

do it with you." Id. at 85, 126. In that same vein, Leonard testifies that Parker "would rub on your arm sometimes, acting like he was your girlfriend, [like] he wanted to get with you." Id. at 171. Leonard alleges that Walton "was laughing and cutting up" with Lampi and Parker regarding the homosexual comments and playacting, id. at 168-69, and that he would make comments like, "Oh, yes, I agree with you on that. That's good," id. at 132-33. However, Leonard was unable to recall any sexual remarks attributable to Walton. See id. at 133, 169.

Leonard told Lampi and Parker on several occasions that their touching and sexual remarks were unwelcome. Plaintiff also complained to Lampi about Walton hitting and running into him. However, Lampi downplayed Leonard's concerns, stating, "We [presumably himself, Parker, and Walton] just feed on you getting mad about it. Every time you get mad about it, it just makes us want to do it more. . . . We're just playing around. We don't mean nothing [sic] by it." Id. at 173-74. Lampi did not alter his own conduct or discipline Parker or Walton in any way.

On two occasions before he transferred to the Pelham store, Leonard also voiced concerns to his area advisor, Lib Wood, who was Lampi's supervisor, when she visited the Pell City store. Leonard admits, however, that he did not go into any detail at either of these meetings with Wood, instead complaining generally about too much playing and joking around in the store. See Plaintiff's Depo. at 191-92. On occasion Wood reminded Lampi of the importance of acting professionally, Wood Depo. at 62, but Leonard's work environment at the Pell City store did not change.

On October 16, 1997, Leonard was given a written reprimand by Lampi, based upon an allegation that a customer had complained to him that Leonard had made negative comments about AutoZone and its employees while making a delivery. Defendant's Ex. 9. Specifically, Leonard was alleged to have remarked about problems one of his brothers had with a warranty on a motor he purchased from an AutoZone store, see id.; see also Plaintiff's Depo. at 212-13, and about problems another brother, who was also an AutoZone employee, had been

experiencing with AutoZone after he was injured while driving a truck at work. Defendant's Ex. 9. Leonard admitted he had said that his brother employed by AutoZone was not doing well in that he was out of work after undergoing knee surgery and had not received compensation, although Leonard told Lampi that he had not made negative remarks about the company itself or about the warranty, Plaintiff's Depo. at 231-34. At the meeting's conclusion, Lampi warned Leonard against discussing with customers anything that could harm the company's image or business, and he advised Leonard that if such was repeated, he could be terminated. Id. at 236.

On November 3, 1997, Wood administered to Leonard another written reprimand based upon allegations that he had expressed dissatisfaction with AutoZone and its employees. Defendant's Ex. 10. In October 1997, the manager of AutoZone's store in Oneonta, Alabama, Bonita Bartley, gave Wood a written statement indicating that Leonard had been in her store on a number of weekends making remarks in front of her and other employees about how he "felt like he was done wrong by AutoZoners and AutoZone itself," Defendant's Ex. B to its Motion For Leave to Submit Additional Record Evidence, Doc. No. 23. Bartley also told Wood that Leonard had stated he felt that he had been "stabbed in the back by fellow AutoZoners [that] he worked with . . . or [that] he trained and how these AutoZoners are now in a higher position than [Plaintiff]," id., and that AutoZone had dealt with him unfairly by putting him in a non-management position at the Pell City store. Defendant's Ex. 13. Similarly, Roger Holden, an AutoZone management trainee, told Wood that he had heard Leonard making negative comments about AutoZone and its employees while he was training in the Pell City store. See Defendant's Ex. 14. Holden later prepared "a short statement" about the remarks he heard and "provided it" to Wood, and it indicated that Leonard complained that AutoZone had treated him unfairly by allegedly cheating him out of a management position at the Pelham store and that he was being treated badly because of his brother's truck accident, and that he felt persecuted by the other personnel at the Pell City

store. Defendant's Ex. A to its Motion For Leave to Submit Additional Record Evidence, Doc. No. 23. Wood advised Leonard of these allegations by Bartley and Holden and she warned him that he could be terminated he continued to make such remarks. Defendant's Ex. 10. Leonard did not tell Wood at the time that he disagreed with this disciplinary action, Plaintiff's Depo. at 245, although he now contends that he did not say anything derogatory about the company itself, and that he had, rather, just expressed to Bartley and Holden "some of the things that were going on [he] didn't like." Id. at 242.

On December 12, 1997, Leonard's wife, Kelly Leonard, phoned AutoZone's district office in Gardendale, Alabama, and lodged an anonymous complaint regarding Lampi's offensive behavior. One evening about two or three months earlier, she had phoned the Pell City store, and while the phone was placed down on the counter, she heard Lampi ask another employee "how it felt to have his [Lampi's] balls slap his [the employee's] chin." Kelly Leonard Depo. at 34. After discussing with Leonard whether she should complain, she phoned AutoZone's district human resources manager posing as a customer, reporting that she had called the Pell City store and that she heard David Lampi making vulgar homosexual remarks in the background and that another time she had seen Lampi grabbing and "hunching on" store employees in an obscene manner while she and other customers were in the store. Plaintiff's Ex. 14 at 2; Plaintiff's Ex. 16, statement of Dot Thomas at 1. See also Wood Depo. at 77-78. Prompted by this call, on December 15, 1997, AutoZone had a representative of its loss prevention department question Lampi, who denied that he had done or said anything inappropriate. See Plaintiff's Ex. 14 at 4. No other employees were questioned, and Lampi was not disciplined.

Wood also became aware of the anonymous phone complaint regarding Lampi, although she did not know that the caller was Leonard's wife until after he was terminated. See Wood Depo. at 122. Shortly after Lampi was questioned by loss prevention, Wood spoke with him as well, reiterating the importance of mature, professional conduct. Wood Depo. at 61-64, 92-

93. Indeed, there is evidence reasonably indicating that at that time Wood at least informally warned some Pell City store employees specifically against engaging in sexual conduct, including "dry humping." See Plaintiff's Ex. 12, Walton Statement at 2 (wherein he wrote, "Our area advisor Lib Wood talked to us about dry humping and so-forth around Nov-Dec. 97 . . ."); Plaintiff's Ex. 16, Kevin Hulsey Statement at 1 (wherein this store employee indicated on April 27, 1998 that he had witnessed "dry humping, slapping on the rear" and that such acts halted about six or seven months prior, after "Lib Woods [sic] said that it had to stop.")

On April 1, 1998, Lampi administered another written reprimand to Leonard. This time, Leonard was charged with violating company policy by allegedly soliciting and performing repair work on customers' vehicles on company property for personal gain. Leonard told Lampi that these allegations were untrue and that he had never taken any money to perform repairs for customers.

About this same time, about three or four weeks before he was terminated, Leonard again met with Wood. While he was on vacation, Leonard went to Wood's office and told her that he was unhappy "with the way things were going" and "the horseplay" at the Pell City store, and that he would be willing to accept a transfer. Plaintiff's Depo. at 200-01. He also allegedly gave her a written statement that indicated the sexual nature of some of the behavior to which he was being exposed, including descriptions of "slapping on the buttocks" and "the putting their arm around them and leaning over and acting like they wanted to kiss them." [sic] Id. at 203-04.[3]

---

[3]AutoZone has submitted evidence of a written statement signed by Leonard and Wood that does not contain allegations by Leonard that he was being subjected to sexual harassment. See Defendant's Motion for Leave to Submit Additional Record Evidence, Doc. No. 23, Ex. C. AutoZone argues that this statement conclusively refutes Leonard's assertion that he gave a written statement to Wood at his meeting with her in early April 1998 indicating that Lampi, Parker, and Walton were engaging in sexual conduct. The Court disagrees. The writing recently produced by AutoZone is dated April 20, 1998, the date of Plaintiff's termination. The Court concludes that a factfinder could reasonably find that Plaintiff submitted a different writing to Wood in their meeting in early April 1998.

Also during this same time period in early April 1998, Lampi received information indicating that Leonard had been discussing with customers the recent problems surrounding the professional relationship between Leonard and himself. On April 6, 1998, Lampi and James Hairston, a Pell City store employee who dealt with commercial accounts, were approached in the store by a customer who said that Leonard had told him that he, Leonard, had been "written up" based on false charges, that Lampi was "picking on him" because Lampi did not like him. Defendant's Ex. 11 at 1. After Lampi told the customer that the situation did not concern him, the customer replied that it did because he had to listen to complaints about it "all day" and that Leonard and Lampi should "kiss and make up." Id. Similarly, on April 10, 1998, Hairston supplied a written statement to Lampi indicating that he had been approached twice in the previous week by commercial account customers asking about what was happening at the store, because Leonard had been involving the customers in "performance issues" between himself and Lampi, and had thereby placed customers in an awkward position. Id. at 2. Leonard admits that after being disciplined on April 1, 1998, he told a commercial customer that he had been wrongly accused of certain things and that he was not happy about it. Plaintiff's Depo. at 249-52.

Lampi told Wood that Leonard had again been speaking with customers about problems he felt he had with the company and/or its employees. Wood Depo. at 113. Wood reviewed written statements of the recent allegations provided by Lampi and Hairston, and she subsequently spoke with the latter. Id. at 115. Wood then gathered the records and supporting employee statements concerning Leonard's prior written reprimands for making negative comments about AutoZone and its employees and conducting personal business on company property, and she presented them to her supervisor, Mike Stebbins, a district manager. Id. at 124. Wood recommended to Stebbins that Leonard be fired. Id. at 112. Stebbins, in turn, made the ultimate decision to terminate Leonard, with input from "AutoZoner Relations," which apparently includes attorneys in the company's legal

department. See Stebbins Depo. at 82-83. According to Stebbins, he decided to terminate Leonard based solely on the allegations that he had made negative comments about the company and its employees after being reprimanded for similar misconduct, and not on the alleged solicitation of personal business on company property. Id. at 84-85, 89.

On April 20, 1998, Wood met with Leonard at the Pell City store and told him that his employment was terminated. Lampi was present at this meeting. On the termination report, the official reason given was that Leonard had committed "[a]cts and conduct detrimental to AutoZone and fellow AutoZoners." Defendant's Ex. 12. At the meeting with Wood, Leonard admitted in writing that he had gone into the Oneonta AutoZone store and talked about frustrations with AutoZone to the store manager there. Ex. C at 4 to Defendant's Motion For Leave to Submit Additional Record Evidence, Doc. No. 23. Leonard also acknowledged that he had made negative remarks to Roger Holden and to commercial customers about certain AutoZone employees, but not against the company itself, and that he had done so even after he had been disciplined for similar misconduct. Id. at 4, 5. Leonard also conceded that he "may have once or twice" told a customer that he would work on his car for a price, although he denied ever actually taking money for working on a car at the store. Id. at 5.

The day after his discharge, Leonard phoned William McCawley, a vice president of store operations for AutoZone. Leonard made allegations about the sexual behavior he endured at the Pell City store and charged that he had been treated unfairly. This led to a full internal investigation, which, in turn, resulted in AutoZone terminating Lampi, Parker, and Walton in early May 1998, after they acknowledged engaging in most of the sexually inappropriate conduct and roughhousing alleged by Leonard in the this lawsuit.

On June 2, 1998, Leonard filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been subjected to a hostile work environment because of sex, and that he was terminated in retaliation for complaining about such harassment. After Leonard received his "right-to-sue" letter from the the EEOC, this suit

followed.  In it, he brings the following claims against AutoZone: (1) that he was subjected to a hostile work environment because of sex, in violation of Title VII; (2) that he was terminated in retaliation for complaining about sexual harassment, also in violation of Title VII; (3) that the actions of Lampi, Parker, and Walton constituted the tort of invasion of privacy under Alabama law, for which AutoZone is liable; and (4) that some of the actions of Lampi, Parker, and Walton constituted the tort of battery, for which AutoZone is liable.  AutoZone has now filed a motion arguing that it is entitled to summary judgment on each of these claims.

## II.  DISCUSSION

### A.  Federal Law Claims

#### 1. Hostile Work Environment

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination "because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It expressly prohibits refusing to hire or discharging an employee based on a prohibited factor. Id. Likewise, Title VII also expressly provides that "[i]t shall be an unlawful employment practice for an employer . . . otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Id.  While the statutory language of Title VII does not contain the words "sexual harassment," the Supreme Court and the United States Court of Appeals for the Eleventh Circuit have recognized that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  See also Henson v. City of Dundee, 682 F.2d 897, 901 (11th Cir. 1982).  In Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S.Ct. 998, 1002 (1998), the Supreme Court clarified that the protections of Title VII extend to same-sex harassment and that the "harassment need not be motivated by sexual desire to support an

inference of discrimination on the basis of sex."

In order to establish a hostile-environment sexual-harassment claim under Title VII based on harassment by a supervisor, an employee must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment, (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (citing Henson, supra, 682 F.2d at 903-05.

For purposes of its motion for summary judgment, AutoZone appears willing to assume that there is sufficient evidence to indicate reasonably that Leonard falls within a protected group, that he was subjected to some level of unwelcome harassment, and that such harassment was "because of . . . sex," within the meaning of Title VII.[4]  Thus, the motion does not present issues as to elements (1), (2), or (3) set forth above.  Rather, AutoZone directs its attack towards element (4), that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and element (5) that there is a basis for holding it, as the employer, liable.  Before examining these issues, however, the Court notes that AutoZone raises a threshold matter regarding exactly what events and time period may be properly considered as forming the basis of Leonard's

---

[4]The Court notes that in most same-sex harassment cases, employers make challenges at the summary judgment stage on the ground that the harassment was not "because of" the employee's sex, within the meaning of Title VII.  See, e.g., Shepherd v. Slater Steels Corp., 168 F.3d 998, 1007-1011 (7th Cir. 1999); Johnson v. Hondo, Inc., 125 F.3d 408, 412 (7th Cir. 1997); Quick v. Donaldson Co., 90 F.3d 1372, 1378-79 (8th Cir. 1996).  However, the Court emphasizes that Defendant has chosen not to do so in this case, apparently based upon allegations that Lampi, Parker, and Walton did not subject female employees to the same types of behavior that Plaintiff claims he endured.  See Oncale, 118 S.Ct. at 1002 (indicating that in order to show that harassment constituted discrimination "because of" sex, "[a] same-sex harassment plaintiff may . . . offer direct comparative evidence about how the alleged harasser treated both sexes in a mixed-sex workplace.") Thus, the Court does not decide this issue.

sexual harassment claim.

### a. Timeliness and the Continuing Violations Doctrine

AutoZone argues that Leonard cannot recover for any harassing conduct occurring during his first period of employment at the Pell City store, because such occurred more than 180 days before he filed his EEOC charge. Defendant's Motion for Summary Judgment at 25 n.116. Under the enforcement procedure set forth in Title VII, a plaintiff must file a charge of discrimination with the EEOC within 180 days of the "alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e); Thomas v. Kroger Co., 24 F.3d 147, 150 (11th Cir. 1994). Although filing such a charge is not a jurisdictional prerequisite to bring suit in federal court, Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982), an employer may raise, as a defense, that an employee's claims are barred by his failure to timely file a charge with the EEOC. See, e.g., Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1435-36 (11th Cir. 1998); Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 658 (11th Cir. 1993), cert. denied, 513 U.S. 814 (1994). The 180-day period "begins to run from the time that the complainant knows or reasonably should know that the challenged act has occurred." McBrayer v. City of Marietta, 967 F.2d 546, 547 (11th Cir. 1992); Stafford v. Muscogee County Bd. of Ed., 688 F.2d 1383, 1387 (11th Cir. 1982).

Leonard filed his charge of discrimination with the EEOC on June 2, 1998. This would establish a 180-day limitations period beginning on December 4, 1997. However, such does not necessarily mean that he cannot recover in this case for harassment occurring before that date. The Eleventh Circuit Court of Appeals recognizes a continuing violation exception to the 180-day limitations period of Title VII. "Where an employee charges an employer with continuously maintaining an illegal employment practice, he may file a valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice." Beavers v. American Cast Iron Pipe Co., 975 F.2d 792, 796 (11th Cir. 1992). Thus, where it is shown that a hostile workplace is a continuing violation of Title

VII, the employee may recover for the entire period of that violation, even though some of its constituent events occurred prior to the 180-day limitations period. See, e.g., Anderson v. Reno, 190 F.3d 930, 936-37 (9th Cir. 1999); Kline v. City of Kansas City, Mo., Fire Dept., 175 F.3d 660, (8th Cir. 1999); Waltman v. International Paper Co., 875 F.2d 468 (5th Cir. 1989). Further, it has been noted that a hostile work environment, by its very nature, often involves a continuing violation. See, e.g., Thomas v. Eastman Kodak Co., 183 F.3d 38, 54 (1st Cir. 1999); Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1109 (9th Cir. 1998); West v. Philadelphia Electric Co., 45 F.3d 744, 755 (3rd Cir. 1995); Gipson v. KAS Snacktime Co., 83 F.3d 225, 228 (8th Cir. 1996); Waltman, 875 F.2d at 476.

In this case, Leonard contends that he suffered sexual harassment at the Pell City store more-or-less continuously from the time that Lampi became manager in about 1995 until Leonard was discharged on April 20, 1998. If Leonard had worked at the Pell City store during that whole time, the Court might be inclined to conclude that the continuing violation doctrine would allow consideration of harassing events during that entire period. However, Leonard accepted an unsolicited promotion offer to be the assistant manager at the Pelham location, where he worked from about January 1997 until about mid-June 1997. He acknowledges that he suffered no harassment during that period. Generally, where an employee spends a significant period of time outside of the hostile workplace, such may allow its effects to dissipate and thus mark the end to what would otherwise constitute a continuing violation. See Wilkins v. Lawson State Community College, CV 97-BU-874-S (N.D. Ala. December 23, 1998) (unpublished memorandum opinion granting in part and denying in part defendant's motion for summary judgment); Gipson v. KAS Snacktime Co., 171 F.3d 574, 580 (8th Cir. 1999); Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 715 (3rd Cir. 1997), cert. denied, 118 S.Ct. 1079 (1998). But compare Waltman, supra, (where the court considered incidents of harassment both before and after a plaintiff's 2 ½-month medical leave of absence allegedly occasioned because the harassment caused the plaintiff to become ill). Based upon the

approximate 6-month gap where he worked in a harassment-free environment at the Pelham store, the Court concludes that Plaintiff cannot recover for harassment occurring prior to his return to the Pell City location in about mid-June 1997. Accordingly, AutoZone is entitled to summary judgment to the extent Leonard bases his hostile work environment claim on such events.[5]

    b. Severe or Pervasive Harassment

AutoZone argues that the harassment Leonard endured during his second period of employment at the Pell City store from about mid-June 1997 to April 20, 1998, was not sufficiently severe or pervasive to render his work environment actionable under Title VII. "Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal 'civility code.'" Medoza, 195 F.3d at 1245 (quoting Oncale, 118 S.Ct. at 1000-02). Rather, harassment in the workplace is actionable only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." Harris, 510 U.S. at 21 (citations and internal quotation marks omitted). "Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." Medoza, 195 F.3d at 1246 (citing Harris, 510 U.S. at 21-22). That is, the environment must be one that a reasonable person would find hostile or abusive and that the victim himself or herself actually perceives to be hostile or abusive. Id.

---

[5]While Leonard may not recover on his Title VII harassment claim for events occurring prior to his last period of employment at the Pell City store, that is not to say that evidence of such prior events must be excluded at trial. The limitations period of Title VII is not necessarily a bar to the admissibility of pre-period acts that bear upon the work environment and on the employer's awareness of that environment. West, supra, 45 F.3d at 748. While evidence of discriminatory treatment may concern time-barred conduct, it may be relevant to illuminate current practices which, viewed in isolation, may not indicate discriminatory treatment. Allen v. County of Montgomery, Alabama, 788 F.2d 1485, 1488 (11th Cir. 1986).

In the instant case, AutoZone seems to raise some question of whether Leonard subjectively perceived his work environment to be hostile or abusive, based upon the fact that he voluntarily requested a transfer back to the Pell City store from the Pelham store. Defendant's Reply Brief at 21. Notwithstanding, the Court concludes that Leonard's testimony of his many complaints and his subjective perception of the harassing conduct provides more than enough evidence to reasonably indicate that he considered his work environment at Pell City to be hostile or abusive. Thus, the real issue here is the objective component: whether Leonard's work environment was hostile or abusive "when judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Mendoza, 195 F.3d at 1246 (further citations and internal quotation marks omitted).

The "fact intensive" inquiry into whether a plaintiff's work environment is objectively hostile or abusive includes consideration of the following four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Mendoza, 195 F.3d at 1246 (citing Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris, 510 U.S. at 23)). The harassing conduct must be examined as a whole and in context, not as isolated acts. Id.

AutoZone concedes that the conduct of Lampi, Walton, and Parker was inappropriate, but AutoZone chalks up all of it to simple teasing, roughhousing, and horseplay. The Court would admit that some of the behavior Leonard apparently finds objectionable would seem to fall into those categories, most notably Lampi and Parker's continuous homosexual playacting towards each other and some of Walton's attempts at physical humor. However, the Court concludes that there is a genuine issue of fact regarding whether a reasonable person would find that Leonard's work environment was hostile or abusive. Plaintiff alleges that he was repeatedly subjected to unwanted touching in both sexual and non-sexual ways by Lampi, Parker, and Walton. Some of this contact may not reflect any particular malevolence or

genuine sexual interest on their part, but the Court cannot say that a reasonable person could not find a substantial portion of it to be physically intimidating or humiliating. Most notably, the Court finds that a reasonable person could be extremely mortified by Lampi and Parker's numerous incidents of targeting Leonard for "dry humping," which occurred in front of co-workers and at least one time in front of Leonard's wife. See Bacon v. Art Institute of Chicago, 6 F.Supp. 2d 762, 767 (N.D. Ill. 1998) ("One can hardly imagine a more humiliating experience for an employee than being called into a room by a supervisor, being told to bend over, and having the supervisor simulate anal sex in front of coworkers.") Even if a portion of Leonard's complaints in this case might reveal a certain prudishness or hypersensitivity on his part, the Court concludes that his allegations of being the recipient of simulated anal sex on numerous occasions, taken with the pervasive and physical nature of other incidents, would allow a finding that his work environment crossed the threshold into hostility or abusiveness. See id. (holding summary judgment improper where plaintiff was "continually subjected" to a supervisor's "physically abusive behavior" and supervisor simulated anal sex on plaintiff in front of co-workers).

### c.  Employer Liability and the Faragher/Ellerth Affirmative Defense

AutoZone next argues that it cannot be held liable for harassment perpetrated by Lampi, Parker, and Walton.  AutoZone acknowledges that in the companion cases of Burlington Industries v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 2270 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2292-93 (1998), the Supreme Court held that an employer is vicariously liable for the sexual harassment committed by a supervisor with immediate or successively higher authority over an employee.  There is no dispute that Lampi, Parker, and Walton all had supervisory authority over Leonard from the time he transferred back to the Pell City store in about mid-June 1997 until he was terminated on April 20, 1998. However, AutoZone points out that in Ellerth and Faragher the Supreme Court also recognized that where no tangible employment action, such as termination or unwanted reassignment, is

taken against the employee, the employer may interpose an affirmative defense comprised of two parts, which the employer must prove by a preponderance of the evidence: the employer can escape liability by demonstrating (a) that it took reasonable steps both to prevent sexual harassment and to remedy the sexually harassing conduct promptly once it was brought to the employer's attention, and (b) that the victimized employee unreasonably failed to avoid harm or utilize any remedial opportunities made available by the employer. See Ellerth, 118 S.Ct. at 2270; Faragher, 118 S.Ct. at 2292-93. AutoZone argues that it is eligible to assert this defense and that it can establish it as a matter of law.

In response, Leonard asserts that AutoZone cannot raise the affirmative defense because he was fired, which undisputedly constitutes a tangible employment action. The United States Court of Appeals for the Eleventh Circuit has indicated, however, that an employer is not prevented from raising the defense where the tangible employment action was not taken by a harassing supervisor. See Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1367 (11th Cir. 1999) (indicating that the Faragher affirmative defense may be asserted "where no tangible employment action has been taken by the [harassing] supervisor") (emphasis added); Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1247-48 (11th Cir. 1998) (holding that a plaintiff could not benefit from an inference that she was discriminatorily terminated where the evidence indicated that the decision to fire her could not be attributed to the harassing supervisor). There is no dispute that neither Parker nor Walton played a part in the decision to terminate Leonard. However, Leonard does suggest that Lampi played an "important role," contending that he "was present when the plaintiff was terminated and he provided most all of the tainted information that was the basis of the plaintiff['s] termination." Plaintiff's Reply Brief at 35.

AutoZone points out that Stebbins claims that he made the ultimate decision to end Leonard's employment, and there there is evidence indicating that Wood might also be considered a decision-maker insofar as she recommended to Stebbins that Leonard be

terminated. However, both Stebbins and Wood deny that Lampi made any recommendation or provided any input, aside from bringing to Wood a number of the allegations of Leonard's complaints that were used as a substantive justification for the termination decision. Leonard has failed to present substantial evidence disputing this account, so the record shows that Lampi did not, in the strictest sense, actually "decide" that his employment should end. However, the inquiry does not end there.

Leonard suggests that Lampi nonetheless actually caused his termination by his bringing "tainted information" to Wood's attention regarding his complaints to customers and other employees. The United States Court of Appeals for the Eleventh Circuit has suggested that even when the harasser in a Title VII case is not the decision-maker, if a plaintiff shows that the harasser employed the decision-maker as his "cat's paw" – i.e., the decision-maker was manipulated in some way by the harasser without himself evaluating the employee's situation – causation is established. See Wright v. Southland Corp., 187 F.3d 1287, 1304 n.20 (11th Cir. 1999); Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331-32 (11th Cir. 1999); Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998). "In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers." Llampallas, 163 F.3d at 1249, citing Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990); Ellerth, 118 S.Ct. at 2269.

The record indicates that Wood received some allegations from Lampi regarding Leonard's complaints to customers and employees and that she passed these along, with her recommendation that he be terminated, to Stebbins, who used this information as part of the justification for firing Leonard. However, the record also shows that Wood performed an independent investigation into whether Leonard had been making negative comments. While Wood did not herself verify each and every allegation made by Lampi, she received and passed on to Stebbins statements not only from Lampi, but also from three other employees who are not alleged to have harassed Leonard, James Hairston, Bonita Bartley, and Roger Holden,

reflecting that Leonard had made negative remarks about AutoZone and/or its employees. Moreover, while Leonard contends that the information Lampi brought to Wood was "tainted," he has not presented substantial evidence disputing the truth of Lampi's allegations to Wood that customers registered complaints about Leonard's statements about AutoZone or its employees while in their accounts. See Wright, 187 F.3d at 1304 n.20. Finally, Wood herself administered the November 3, 1997 disciplinary action to Leonard based upon allegations that he had made improper comments about the corporation and its employees, and he did not indicate to Wood at that time that he disputed the truth of those allegations. Because Wood performed an independent investigation, there is insufficient evidence to indicate that Lampi used Wood or Stebbins as his cat's paw.[6] Accordingly, the Court resolves that there is insufficient evidence to indicate that Lampi caused Leonard's termination, so AutoZone is eligible to raise the Faragher/Ellerth affirmative defense. The Court concludes, however, that AutoZone has not established the defense as a matter of law.

As noted previously, in order to set up the affirmative defense, an employer must show BOTH: (a) that it took reasonable steps both to prevent sexual harassment and to remedy the sexually harassing conduct promptly once it was brought to the employer's attention, and (b) that the victimized employee unreasonably failed to avoid harm or utilize any remedial opportunities made available by the employer. See Ellerth, 118 S.Ct. at 2270; Faragher, 118

---

[6]Even assuming that the Stebbins did not independently investigate the allegations regarding Plaintiff's negative remarks, but instead relied entirely upon Wood's recommendation, the Court concludes that Wood's investigation would operate to cut off the chain of causation that might exist between any discriminatory animus on Lampi's part and Plaintiff's termination. Cf. Jones v. Bessemer Carraway Medical Center, 137 F.3d 1306 (11th Cir.), opinion superseded in part on denial of reh'g, 151 F.3d 1321, 1323 (11th Cir. 1998) (finding insufficient evidence to establish prima facie case that plaintiff's termination for violation of work rule was caused by racial animus where employee with alleged animus reported plaintiff's violation to her supervisor, who independently verified that a rule was violated and then referred the violation to personnel committee, which made the final termination decision). In such a circumstance, it might be argued that Wood used Stebbins as her "cat's paw," but this is inconsequential because Wood is not alleged to have herself sexually harassed Plaintiff.

S.Ct. at 2292-93. Leaving aside whether Leonard unreasonably failed to avoid harm, the Court concludes that there is sufficient evidence to allow a reasonable determination that AutoZone failed to act reasonably to remedy sexually harassing conduct promptly once it was brought to its attention. The evidence suggests that at least as early as mid-December 1997, following the anonymous complaint registered by Leonard's wife and about four months prior to Leonard's termination , AutoZone knew Lampi was alleged to have used explicit sexual language with his employees and that he was "hunching" on them in an obscene sexual manner. AutoZone does not dispute that these were serious allegations that, if proven true, would be grounds for immediate discharge. Nonetheless, AutoZone's loss-prevention representative questioned only Lampi, even though the caller's charges implied that other store employees had witnessed the alleged behavior and it would have been a relatively simple matter to question them. In fact, Stebbins acknowledges that if he had been in control of that investigation, he probably would have questioned other employees, Stebbins Depo. at 47. Moreover, it seems likely that if AutoZone had done so, the occurrence of "dry humping" and other inappropriate touching would have been substantiated, as AutoZone's later and more thorough investigation indicates. In addition, the evidence reasonably indicates that at about this same time Wood was aware of the "dry humping" going on in the store, see Plaintiff's Ex. 12, Walton Statement at 2; Plaintiff's Ex. 16, Kevin Hulsey Statement at 1, but that she only verbally and informally advised the employees that they should not conduct themselves in such a manner. Finally, there is evidence reasonably indicating, when evaluated in the light most favorable to Leonard, that he told Wood three weeks before his termination that he was uncomfortable working in the Pell City store because Lampi, Walton, and Parker were engaging in inappropriate conduct, including slapping him on the buttocks, wrestling, using "foul mouth talk," and acting like they wanted to kiss him. This, the Court concludes, is sufficient to put AutoZone on notice that it should investigate possible sexually-harassing conduct, especially in light of the December 1997 complaint against Lampi. The Court concludes that a factfinder could rationally find that

Page 23 of 34

AutoZone's failure to question any other employees besides Lampi, Wood's decision merely to informally speak with store employees and failure to follow up after her meeting with Leonard in early April 1998 constituted an unreasonable failure on the part of AutoZone to remedy sexually harassing conduct of which it knew or reasonably should have known.[7]

AutoZone might be able to prevail on the <u>Faragher/Ellerth</u> affirmative defense at trial. However, AutoZone has not shown that it is entitled to judgment as a matter of law based upon the defense. Accordingly, AutoZone's motion for summary judgment on the Title VII sexual harassment claim, based upon events following Leonard's return to the Pell City store in about mid-June 1997, is due to be denied.

### 2. Retaliation

Pursuant to 42 U.S.C. 2000e-3(a), an employee is protected from discrimination (1) if "he has opposed any practice made an unlawful employment practice by [42 U.S.C. § 2000e]" (the opposition clause) or (2) if "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [42 U.S.C. § 2000e]" (the participation clause). As explained previously, sexual harassment is an unlawful employment practice under 42 U.S.C. § 2000e. Leonard's claim here is under the opposition clause, as he argues that AutoZone violated Title VII by allegedly terminating his employment because he complained about being sexually harassed.

In this case, Leonard offers no direct evidence that he was terminated because he complained about being sexually harassed. Rather, he attempts to prove this claim by using circumstantial evidence. When a plaintiff seeks to establish a Title VII retaliation claim using such evidence, courts apply the burden-shifting framework established by the Supreme Court

---

[7]The Court would note that there is substantial evidence indicating that Pell City store employees ceased engaging in behavior of a sexual nature after Lampi and Wood held meetings in December 1997 after the anonymous complaint lodged by Leonard's wife. However, Leonard alleges that his work environment did not change at all after that incident until the time he was terminated on April 20, 1998. At this stage of the proceedings, Leonards version of events must, of course, be credited.

in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Wright v. Southland Corp., 187 F.3d 1287, 1305 (11th Cir. 1999), citing Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir. 1993). Under this framework, the plaintiff first must establish a prima facie case of retaliation. The establishment of a prima facie case creates a presumption that the employer unlawfully retaliated against the employee. The employer must then offer a legitimate, nondiscriminatory reason or reasons for the employment action to rebut the presumption. If the employer satisfies its burden, the presumption of retaliation drops from the case, and the burden shifts back to the plaintiff to discredit the employer's proffered reasons by showing that they are merely a pretext for unlawful retaliation. See Sullivan v. National R.R. Passenger Corp, 170 F.3d 1056, 1059 (11th Cir. 1999).

In order to establish prima facie case of retaliation, the employee must show: (1) that he engaged in protected activity (2) that he was subjected to adverse job action, and (3) that there is a causal nexus between the protected activity and the adverse action. See Sullivan, 170 F.3d at 1059 (citing Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998); Raney v. Vinson Guard Service, 120 F.3d 1192, 1196 (11th Cir. 1997)). Although AutoZone disputes whether Leonard can prove a causal link between complaints that he was being harassed and his termination, the Court will assume that Leonard has presented sufficient evidence to make his prima facie case. Thus, the onus is on AutoZone to produce sufficient evidence indicating that it terminated Leonard's employment for a lawful reason. AutoZone has met this burden: Stebbins alleges that he fired Leonard because he expressed dissatisfaction and made negative comments about AutoZone and its employees to customers after receiving written reprimands for similar misconduct. Accordingly, the initial presumption of retaliation drops from the case, and the viability of the retaliation claim will be determined at the third and final stage of the McDonnell Douglas analysis: pretext.

In order to survive summary judgment, Leonard must create a genuine issue of material fact as to whether the reason advanced by AutoZone is pretextual. Bogle v. Orange County

Page 25 of 34

Bd. of County Com'rs, 162 F.3d 653, 658 (11th Cir. 1998) (citations omitted). In other words, Leonard must provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for his discharge. Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997), cert. denied, 118 S.Ct. 685 (1998). He may do this (1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). The Court concludes that Leonard has failed to show either one.

It appears to the Court that Leonard attempts to show pretext principally by claiming that he did not actually make some of the complaints that formed the basis for his discharge. However, pretext ordinarily requires more than a showing by an employee that he did not commit an infraction that the employer cites as the motivation for its disciplinary action. It is not a violation of federal employment discrimination laws for an employer to err in assessing the performance of an employee, Moore v. Sears, Roebuck and Co., 683 F.2d 1321, 1323 n. 4 (11th Cir.1982), so "[e]vidence showing a false factual predicate underlying the employer's proffered reason does not unequivocally prove that the employer did not rely on the reason in making the employment decision. Instead, it may merely indicate that the employer, acting in good faith, made the disputed employment decision on the basis of erroneous information. Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991)." Walker v. NationsBank of Florida N.A., 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, J., concurring specially) (further citation omitted). "[E]stablishing pretext is not merely demonstrating that the employer made a mistake [in its assessment of an employee's job performance or conduct], but that the employer did not given an honest account of its behavior." Id. (Footnote omitted).

Leonard offers no evidence indicating that Lampi, Wood, or Stebbins made statements indicating either that they had a bias against him because he made complaints of sexual

harassment or that they did not honestly believe Leonard had made the negative remarks about the company and its employees that allegedly formed the basis for his termination. Indeed, while Leonard disputes whether he made certain remarks that subjected him to disciplinary action, he admits he made others, and there clearly was evidence from a number of sources to support the allegations that Leonard made numerous negative remarks about both AutoZone and its employees to persons both inside and outside of the company. When Leonard was first disciplined by Lampi in October 1997 for making negative remarks, he denied making certain remarks to customers and he indicated disagreement with Lampi's assessment of the facts, but he has not presented any evidence indicating that Lampi did not receive a complaint from a store customer about his comments, as Lampi alleged. Similarly, when he was disciplined again on November 3, 1997, Wood had received statements, both verbal and written, from Bonita Bartley and Roger Holden, who are accused of no wrongdoing, indicating that Leonard had made negative comments about the company itself and other company employees. Moreover, when Wood presented these allegations to Leonard, he did not protest them, giving her no reason to believe the accusations were not true. And finally, when Leonard was alleged to have been discussing with customers his problems with Lampi, he adhered to his position that he should not have been written up on April 1, 1998, but he acknowledges that he complained to at least one customer, and he cannot dispute the account given by both Lampi and James Hairston, who is not claimed to have an improper bias, indicating that they were told by customers that Leonard was involving them in differences between himself and Lampi. Leonard makes a conclusory assertion that Lampi "had [him] fired" because he complained to Lampi about sexual harassment. Plaintiff's Brief in Opposition at 35. However, as addressed previously in the section regarding the application of the "cat's paw" cases, there is no evidence reasonably suggesting that Lampi recommended that Leonard be fired or otherwise played a role in the decision to terminate him, and the record establishes that Wood did not rely simply upon Lampi's allegations in reaching her conclusion that Leonard had made negative comments.

That discussion will not be repeated here. Nor has Leonard presented any evidence that other employees made similar negative remarks after having been warned not to do so and were treated more favorably. Based upon the foregoing, the Court concludes that Leonard has failed to present sufficient evidence to indicate that AutoZone's reason for allegedly terminating his employment is a pretext for retaliation. Accordingly, AutoZone is entitled to summary judgment on Leonard's Title VII retaliation claim.

B. State Law Claims

### 1. Battery

To succeed on a claim alleging battery under Alabama state law, a plaintiff must establish: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. Ex parte Atmore Community Hosp., 719 So. 2d 1190, 1193 (Ala. 1998) (citing Surrency v. Harbison, 489 So. 2d 1097, 1104 (Ala. 1986); Restatement (Second) of Torts § 18 (1965). AutoZone argues that because Leonard understood that Lampi, Parker, and Walton were not genuinely soliciting sex from him when they touched him, he cannot establish that any of the touching was conducted in a harmful or offensive manner. However, even slight physical contact may give rise to an actionable battery despite the fact that it causes no physical injury or bodily pain, provided it occurs intentionally, without consent, and in "an angry or revengeful or rude or insolent manner." Surrency v. Harbison, 489 So. 2d 1097, 1104 (Ala. 1986). The Court concludes that a reasonable person, see Prescott v. Independent Life & Accident Insurance Co., 878 F.Supp. 1545, 1553 (M.D. Ala. 1995), could find that the touching of Plaintiff in this case, which includes being "dry humped" and slapped on the buttocks by Lampi and Parker and being hit, wrestled with, and knocked over by Walton, was harmful or offensive, even if done with some sort of joking intent. See Westcott v. City of Omaha, 901 F.2d 1486, 1489 (8th Cir. 1990) (a "defendant may be liable [for battery] when intending only a joke, or even a compliment, as where an unappreciated kiss is bestowed without consent, or

a misguided effort is made to render assistance," quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on The Law of Torts § 9, at 41-42 (5th ed. 1984)); Lambertson v. United States, 528 F.2d 441, 444 (2nd Cir. 1976) ("[I]t is a battery for a man . . . to play a joke upon another which involves a harmful or offensive contact.") (quoting 1 Harper and James, The Law of Torts 216 (1956)).

AutoZone next argues that it cannot be held liable for any battery Lampi, Parker, or Walton might have committed against Leonard. An employer is liable for the intentional torts of its employee if: (1) the employee's acts are committed in furtherance of the business of the employer; (2) the employee's acts are within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the tortious acts. Ex parte Atmore Community Hosp., 719 So. 2d 1190, 1194 (Ala. 1998) (citing Potts v. BE&K Constr. Co., 604 So. 2d 398, 400 (Ala. 1992).

Leonard contends that there are genuine issues of fact regarding whether AutoZone ratified the tortious acts of Lampi, Parker, and/or Walton. To show ratification, a complaining employee must show that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee, (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted a tort; and (3) that the employer failed to take adequate steps to remedy the situation. Mardis v. Robbins Tire & Rubber Co., 669 So.2d 885, 889 (Ala. 1995).

There is evidence suggesting that approximately three weeks before he was terminated, Leonard told Wood that Lampi and other employees were engaging in unprofessional behavior, including slapping him on the buttocks, which would be sufficient to put Defendant on notice that Leonard was being subjected to conduct sufficient to constitute a battery. There is no

allegation that AutoZone took any substantive corrective action in response to this complaint.[8] Leonard contends that he continued to endure the same harassing conduct up until his termination, so a jury might reasonably infer that AutoZone failed to take adequate steps to remedy the situation. See Machen v. Childersburg Bancorporation, Inc., ____ So. 2d ____, ____, 1999 WL 1207036, *4 (Ala. 1999). The Court concludes that AutoZone is not entitled to summary judgment on Leonard's claim of battery.

## 2. Invasion of Privacy

The tort of invasion of privacy is the wrongful intrusion, physically or otherwise, upon the solitude or seclusion of another or into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. Phillips v. Smalley Maintenance Services, Inc., 435 So.2d 705 (Ala. 1983). Leonard claims that the acts of Lampi, Parker, and Walton are sufficient to constitute invasion of privacy, and that Defendant, as their employer, is vicariously or directly liable for such acts. AutoZone on the other hand, argues that it cannot be held liable, even assuming that the actions of Lampi, Parker, and Walton did invade Leonard's privacy. Again, an employer is liable for the intentional torts of its employee if: (1) the employee's acts are committed in furtherance of the business of the employer; (2) the employee's acts are within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the tortious acts. Ex parte Atmore Community Hosp., 719 So. 2d at 1194.

Leonard seems to suggest that the acts of sexual harassment perpetrated by Lampi, Walton, and Parker underlying his claim for invasion of privacy were committed either in the line and scope of their employment or in furtherance of AutoZone business. The Court disagrees. While the actions occurred at work, the record indicates that this conduct was not

---

[8]Wood says she did not take any corrective action because, she alleges, Leonard never told her the specific conduct in question; she claims that he merely complained about too much "goofing off" in the store.

motivated by any desire to further any purpose of the employer, preventing liability under the theory of <u>respondeat superior</u>. <u>See Busby v. Trustwal Systems Corp.</u>, 551 So. 2d 322, 327 (Ala. 1989) (holding that sexually harassing conduct, while sufficient to establish a claim of invasion of privacy, could not be attributed to serving any purpose of the employer); <u>Ex parte Atmore Community Hosp.</u>, 719 So. 2d at 1194.

Leonard also argues that AutoZone can be held liable for invasion of privacy because it ratified conduct constituting that tort. To show ratification, a complaining employee must show that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee, (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted a tort; and (3) that the employer failed to take adequate, <u>i.e.</u>, reasonable and necessary, steps to remedy the situation. <u>Mardis</u>, 669 So. 2d at 889.

Leonard contends that he reported Lampi, Parker and Walton's "remarks" to Wood and that she took no action to prevent further harassment. Plaintiff's Brief in Opposition, at 36. However, the undisputed evidence indicates that the complaints Leonard made to Wood prior to his meeting with her three weeks prior to his termination were so vague that they were insufficient to put her, and, thus, AutoZone, as well, on notice that Leonard was being subjected to any kind of conduct that might constitute invasion of privacy. <u>See Busby</u>, 551 So. 2d at 327 (granting summary judgment for the employer on outrage claim where there was "no indication that the plaintiffs conveyed their complaints . . . in any detail.") Plaintiff also maintains that Wood advised Stebbins that Plaintiff was being sexually harassed. The record, however, does not support that assertion. Wood and Stebbins both concede that they discussed some problems expressed by Leonard, but only to the extent that he complained generally about employees "goofing off" in the Pell City store. That is too vague to charge Stebbins, and thus AutoZone with knowledge of tortious conduct. <u>Busby</u>.

Leonard also contends that AutoZone could be charged with knowledge of Lampi,

Walton, and Parker's sexually harassing conduct because Roger Holden knew of such conduct. The Court disagrees. An essential element of a corporation's "ratification" of a tort committed by its agent, so as to render the corporation liable, is knowledge on part of an officer or employee of the corporation with authority to ratify. Luquire Ins. Co. v. Parker. 241 Ala. 621, 4 So. 2d 259 (1941), overruled on other grounds, Cooper v. Alabama Farm Bureau Mut. Cas. Ins. Co., 385 So. 2d 630 (1980). See also 3 A's Towing Co. v. P & A Well Service, Inc., 642 F.2d 756, (5th Cir. Unit A April 13, 1981) ("A ratification may be held to have occurred when corporate personnel with the authority to bind the corporation acquire, or are charged with, knowledge of the unauthorized act and fail to repudiate it within a reasonable period of time.") In the context of ratifying sexually harassing conduct giving rise to state law tort claims, Alabama courts have indicated that knowledge of the conduct must be attributable to someone who has authority to take steps on behalf of the corporation to remedy the situation. See, e.g., Machen v. Childersburg Bancorporation, ___ So. 2d ___, 1999 WL 1207036 (Ala. 1999) (it was undisputed that defendant bank had actual knowledge of the alleged wrongful conduct where plaintiff reported to it the bank's chief operations officer); Ex parte Atmore Community Hosp., 719 So. 2d 1190 (implying that knowledge of harasser's supervisor was sufficient to be charged to company); Busby, 551 So. 2d at 323 (same). In this case, there is no dispute that Holden, a management trainee working temporarily in the Pell City store, had no authority to discipline Lampi, Walton, or Parker. Thus, the Court concludes that even assuming Holden was aware of harassing conduct by those employees that would be sufficient to establish invasion of privacy, his knowledge cannot be imputed to AutoZone for purposes of ratification. Cf. Lamb v. Household Credit Servs., 956 F.Supp. 1511 (N.D. Cal. 1997) (knowledge of harassment on part of employee with no authority over harasser could not be imputed to employer, for purposes of Title VII harassment claim).

Finally, Leonard notes that in his meeting with Wood about three weeks before his termination, he did more specifically identify some of the conduct he found harassing,

suggesting that he was being slapped on the buttocks and that Lampi and Parker would engage in homosexual playacting. [9] However, even if Leonard did relay the occurrence of such conduct to Wood, the Court concludes that those acts fall far short of establishing that Leonard's privacy was potentially being tortiously invaded. See McIsaac v. WZEW-FM Corp., 495 So. 2d 649, 651 (Ala. 1986) (an employer's repeated advances and propositions and attempts to kiss the plaintiff and putting his arm around her were not sufficient to rise to the level of conduct required to constitute invasion of privacy); Lee v. Longhorn Steaks of Alabama, Inc., 662 So. 2d 672, 676 (Ala. 1995) (holding that horseplay where a co-employee put plaintiff in a headlock did not establish invasion of privacy). Thus, the Court concludes that there is insufficient evidence indicating that AutoZone was aware that Leonard potentially was being subjected to conduct giving rise to the tort of invasion of privacy. Accordingly, the Court finds that AutoZone is entitled to summary judgment on Leonard's state law invasion-of-privacy claim.

## IV. CONCLUSION

Based on the foregoing, the Court concludes that AutoZone's motion for summary judgment (Doc. No. 17) is due to be GRANTED IN PART AND DENIED IN PART. It is due to be GRANTED as to (1) the Title VII hostile work environment claim to the extent it is based on events occurring during Leonard's first period of employment at the Pell City store, (2) the Title VII retaliation claim, and (3) the invasion-of-privacy claim. It is due to be DENIED as to

---

[9] Leonard does not dispute that he never told Wood he was being subjected to simulated anal sex by Lampi and Parker. As discussed in the context of Leonard's Title VII harassment claim, there is evidence indicating that by at least December 1997 Wood was aware that some employees were potentially engaging in "dry humping," despite her assertions that she had no such knowledge. However, there is no evidence to suggest that Wood knew that such conduct was being directed at Leonard in particular. Under Alabama law, the employer has to have "had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee." Mardis, 669 So. 2d at 889 (emphasis added). Therefore, even assuming that the instances of "dry humping" are sufficient to give rise to the tort of invasion of privacy, it cannot be said, under Alabama law, that AutoZone ratified such conduct.

(1) the Title VII hostile work environment claim to the extent it is based upon events occurring during Leonard's second period of employment at the Pell City store and (2) the battery claim. Accordingly, those claims are still viable in this action.

DONE and ORDERED this 27th day of January 2000

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE